Mr Short, you may proceed. Thank you, Your Honor. Good morning. My name is Keith Short. I represent the petitioner appellant Jeff Petermeyer. The primary question before this court today is whether the commission erred in not giving Mr. Petermeyer a wage differential or odd lot permanent total disability. We, our position is that their decision is against the manifest weight of the evidence. We fully understand the burden that that entails. I've been in front of this court many times, so I'm not going to going to reiterate that standard unless the court asked me to. I do want to point to the evidence, though, since that's the only thing that really matters here. There are other than the petitioner himself, there are four primary actors involved in terms of testimonial evidence. There's also a functional capacity evaluation. So we have the two doctors involved, which are Dr. Taylor and Dr. Merkin. Then we have two vocational groups. One is Steve Dolan, retained by petitioner appellant and Gen X Corporation retained by the respondent. To begin with a few things, I do want to clarify in response to something council mentioned in his in their brief, excuse me, about the evidence and suggesting that, for instance, there is evidence that's not in fact evidence in the record, which in fact it is. And I actually have that evidence right here to show the court if they choose to look at it, one of which is we took the position that Gen X, the respondents vocational expert, had placed in its reports that the claimant, Mr. Peter Meyer was unable or unlikely to return to the same job. That is in the record at C. It starts with report at C1798 and it's actually found on C1795 and it actually starts on 1798 and it says, quote, this is the vocational plan. Claimant unlikely or unable to return to the same job. It's at the very bottom of the page. Earlier in that report, they suggested there was a possibility they would like him to return to construction management or other like jobs. But the conclusion at this report by this lady, Ms. Brenda Latham, was that claimant was unable or unlikely to return to work. So we wanted to correct that misunderstanding. That statement is in fact in the record. And additionally, the Apex Network Physical Therapy Functional Capacity Evaluation, which is at C1504, concludes under their recommendation during the FCE, the worker was noted to lift 23 pounds, occasionally 11 pounds frequently, which places the worker in a light capacity, which is not construction, his job. He had been a construction employee for 35 years, from the age of 18 until the time of this accident. He had never worked in any other capacity. He has this accident. That is not in dispute. The surgery is no longer in dispute. We prevailed in that regard. He ends up with an L3 through S1. That's L3, L4, L5 and S1 fusion by Dr. Taylor. So this Taylor is one of the four that we wanted to talk about today, who evidentially will provide the basis for whether this court reverses. Dr. Taylor is a Yale and Harvard Medical School trained orthopedic surgeon. He spends 50, his time is 50-50 between respondents and petitioners taught at Washington University. He testified that, and he actually testified three times in this case, because this case is 13 years old, actually 11 in litigation. And in his last deposition, he testified that the petitioner's pain is worsening, he has objective radiculopathy, he's increased low back pain, numbness in his hips. That he has what's called SI joint syndrome failure, where the original fusion was L3 to S1. And he said in his second deposition, it's more likely than not that at some point the sites above and below the fusion are going to fail. And then on 4-17-13, he testified, well, that's exactly what's happened. And now, Mr. Petermeyer has a breakdown at the L2-3 level and at L4-5. So you have an unimpeachable orthopedic surgeon who's actually testified this gentleman will never go back to work. He said in his last deposition he'll never lift, he should never lift more than 20 pounds and should never do anything that makes him uncomfortable. And that his next fusion would be morbid, highly morbid, and life altering is what he said. He said he can't climb, bend, stoop. These are all, this is a man who's done construction for 35 years. And the issue of whether these conditions are related to this accident, that's a foregone, that's a settled res judicata issue. So, a collateral estoppel, I suppose. So the issue of Dr. Taylor clearly says, testimonially, he'll never go back to being a construction worker. Then you have Dr. Merkin who testified in his cross-examination that he said, the quote is, if he didn't have to lift more than 40 pounds, I think he has, he said, if I can find, if he could find a job that would let him do that, then he'd go back to construction. The quote is, but I think most construction capacities don't, would not let him work with a maximum lifting pounds of 40 pounds. Now, Dr. Merkin said he could do medium demand work, but he admitted on cross-examination that isn't construction. And there, that confirms that position. So both physicians say he's knocked out of construction, which has been his lifelong 35-year advocation or vocation. And the case law says very clearly that once the petitioner has established, and this is the four city steel directors, the threshold for determination of entitlement to an 8D1 award is whether one is fully or partially incapacitated from pursuing his usual and customary employment. So both doctors have testified, Taylor, he absolutely will never go back to any job. And Merkin says, well, and if you know Peter, if you've been in comp from, I've been in U.S. 31 years, you know who Peter Merkin is. And even Merkin says, well, he'll never really go back to construction. So have we met the prima facie case in terms of the evidence from the doctors? Absolutely we have. The FCE says light duty only. Has he been knocked out of that only career he's ever had? Well, clearly he has. And there's no basis for the commission to have said, well, we think he hasn't been knocked out of that job. There's all the evidence says he has been knocked out of the job. So then you look at the vocational experts. Oh, and by the way, I've left out in addition to Dr. Taylor, I want the court to remember this gentleman lives in central Illinois. He traveled to St. Louis from October of 2009 to February 2015 on 43 occasions to have injections and treatment by Dr. Granberg, the pain management doctor. He's on oxycodone. This is before we've had this rethink about giving prescription medications to at the extent that they've done the pain medications. So he's on oxycodone four to five tablets a day for life. So imagine trying to do any kind of any kind of job where you're taking a pain medication of that severity four to five times a day for life. He's at 11 bilateral SI joint injections. He's a trigger point injections. So you have Dr. Granberg giving him all this treatment. Dr. Taylor saying this man will never go back to any work and Dr. Merkin acknowledging that he'll never go back to his regular employment. You've got the F.C.E. that knocks him out of his job altogether. So have we met the prima facie case? Well, so far. Absolutely. So the argument of does the commission have a basis for rejecting the odd lot or for determining what it did? No, evidentially. Absolutely. Positively not. The evidence is he's knocked out of construction. That's the end. And then we get to Steve Dolan. Steve Dolan is the vocational expert we retained. Steve Dolan has testified 8000 times as an independent evaluator for the Social Security Administration. Mr. Dolan has he interviewed the petitioner on multiple occasions. By the way, he was also Mr. Dolan was director of the State Division of Vocational Rehabilitation. And he also splits his time 50 50 for petitioners and respondents. He says the gentleman is absolutely unemployable. He's had a wonderful work ethic his entire career up until this injury. 35 years in construction. No transferable skill set. Counsel. Yes, ma'am. Yes, sir. You're quoting Dolan now. Yes. Okay. This is our expert. So he says he doesn't have transferable skills. He's a client that claimant had a number of transferable job skills and excellent job history and beneficial qualities. Dolan never said that. Well, no, I'm sorry. I'm what he said was, in terms of his, his intellect and his skill set. Yes. But then you have to combine that with his physical limitations. For instance, we're just arguing to us that Dolan quote had no transferable skill. I misspoke. I don't deny I misspoke. What I meant. What I meant to say was he doesn't have a skill set that will transfer into a job that he physically can do. He doesn't have any college education. He hasn't had any career outside of construction. He hasn't even worked in fast food. So when you talk transferable skill set, does he know how to work a cash register? No. Does he know how to work a scanner? No. He doesn't know how anything other than construction. The answer is no. Who's Berger in this case? Berger was actually retained by Gen X, the respondent. And first they had Miss Latham. And Miss Latham, she's the one who wrote the comment about he is not employable or he's not likely to return to his job. I have it here. But Berger's labor survey demonstrated to her that there was a market for positions within the claimant's restrictions. She disagreed with Dolan. The claimant could not tolerate a regular full day workday. The commission chose to believe her and give her greater weight. Correct? Yeah. Okay. Let me ask you if I may. Based on what? She never met him. She just she also says I will never find anyone to be permanently totally safe ever. Ever. I don't know how you give any credibility to a person who says, look, I only work for respondents and I'll never find it doesn't matter what you tell me, Mr. Short. He's going to be employable. Well, I understand your argument, but isn't it up to the commission to determine the credibility of the witnesses and the weight to be given to the evidence? We don't substitute our judgment, do we? Well, of course, you know, we've actually you and I've actually had this exact conversation before on the Blackman case. And I didn't mean any disrespect then. And I don't now. I think you do. Actually, that is the reason we are allowed to be here. You're allowed to say, well, we don't find that person to be credible. You have that authority. And if you don't have the authority, then an appeal of this nature shouldn't even be allowed to exist. What case law can you cite us that says that we have the right independently of the commission to judge the credibility of the witnesses? OK, I'll give you the one. The force that the city of Chicago case is a perfect example where the commission decided based on the evidence that this person wasn't a perm total. And the appellate court came back and said, no, that person that that you talked about was a was a it was a vote situation. They brought in a vote person at the last minute, a week before the trial. And the appellate court said, no, that's a scam. That was brought in solely for the purpose. And yet the commission found them credible. And this court said, no, we're not going to do that. That person was brought in as a scam. That's why I cite that case was such vigor. It is so on point. It's remarkable. So it's it's you. Should I continue? Oh, yeah. Oh, OK. I'm sorry. So in that instance, you have a gentleman. I'll tell you the facts of that case. You have a gentleman who has bilateral knee problems. You know, you're not going to have time to argue anything else. Yeah, you're right. I'm sorry. Is a vote. Is it is this lady a vote expert? Apparently, they say she is just like Mr. Dolan's a vote expert. But it's important that we think about what she testified about. She's never met this man. She said, I don't even she didn't even know what the final restrictions from Dr. Mr. Short, let me cut you off. Yes, sir. OK, how do you what do you if an expert is presented? How do you either bolster or negate the expert's opinion? What do you go after? Well, I go after the foundation for their opinion. Thank you. And so we're not even talking about credibility, are we? Right. I mean, well, what I'm arguing is the answer to this question or your your discussion. I think you brought it up with credibility. Well, there's no foundation for opinion. I mean, it's whether or not her opinion is reliable, I guess, credible or reliable. The question to me is foundation. She she didn't know what the final restrictions were. She and it does. Credibility is relevant. No, let's get out of credibility. We need to look at whether we can discount or not discount an expert's opinion. And you go after foundation. OK, well, foundation, like I said, she didn't know what the final restrictions were. She disagreed with the FCE conclusions. It said he was only capable of light duty. She disregards the opinion of the medical doctors who talk about what his restrictions are. You know, I understand what the court is saying is that there's a distinction between her foundation and credibility. But those things may interweave. You know, if there's no foundation, then her opinion isn't reliable. It's not credible. And the foundation is completely invalid. She doesn't even know what the restrictions are for him. She doesn't agree with the FCE. She doesn't agree with the doctors. She actually here's the other thing is they brought her in at the last minute. She says, oh, I have jobs for him. And they're in that nine to ten dollar range. And that's actually Mr. Short, your time is up. OK, thank you. OK, thank you. I mean, I'm sorry. Thank you. Time is up. The red lights on. OK, thank you. And you'll have time and reply. Thank you. Five minutes in reply. Mr. Is it style or steel? It's style, but pronounce it however you like. OK, Mr. Style, you may respond. May it please the court. Counsel, my name is Tim Style and I represent the athlete respondent in this case. Respondent respectfully request this court affirm the original commission decision in its entirety. The original commission decision, which was filed on September 26, 2016, awarded 50 percent man as a whole. T.T.D. medical bills and Section 8 credit to respond. The commission found petitioner was not entitled to maintenance benefits or penalties. As opposing counsel brought up, the biggest issue on appeal raised by petitioner is whether the commission award of 50 percent man as a whole is correct. Petitioner argues he is entitled to either a total disability award or a wage differential, but he fails to meet or satisfy the requirements of both. Petitioner argues he has established he's entitled to perm total disability benefits, either on the basis that he's medically unable to work or that he has proven entitlement under the odd lot from total award. For the former, he relies on Dr. Taylor's opinion on July 16, 2014. Dr. Taylor wrote on a work status form that petitioner was, quote, unemployable. Tester's briefing accurately asserts Dr. Taylor indicated on this form that petitioner was permanently and totally disabled. Either way, Dr. Taylor's opinion on employability has no weight. First of all, he's not a vocational expert. Secondly, Dr. Taylor admitted his opinion on July 16, 2014 was based on petitioner's subjective complaints and petitioner's self-reported descriptions of his capabilities and limitations. He admitted there was no change in the exam findings in 2014 in comparison to his prior exam in November of 2012 when petitioner was allowed to return to work with light duty restrictions. Concerning petitioner's physical capabilities, he had an FCE on October 24, 2012. The therapist noted petitioner did not put forth a valid effort. That said, the therapist noted petitioner could work at minimum in a light duty capacity for a full eight hour work day, five days a week. Therefore, petitioner did not establish he was medically unable to work. As noted in the Professional Transportation versus Illinois Workers' Compensation Commission case, an employee generally fulfills the burden of establishing that he or she falls into the odd lot category one of two ways. One, by showing a diligent but unsuccessful search for employment. Or two, by demonstrating that because of age, training, education, experience and condition, there are no available jobs for a person of his or her circumstance. I would like to point out that petitioner's brief has indicated that petitioner was 53 years of age on the date of accident. He was actually, on the date of the accident, he was 44 years of age. He was born on August 4, 1963. And then when the case was actually tried, petitioner was 51. And I don't know if it necessarily matters now at this point, but he puts in the brief that petitioner is now 65 years of age. He's actually 57. So that would be part of the age issue on that second factor I just wanted to bring to your attention. But in considering this issue, one needs to recall petitioner was employed as a construction manager prior to his work accident. After being placed at MMI in approximately one month, he found a job as a construction manager for a friend's home. This is in the exact same line of work he was doing prior to his accident. As noted in his own resume, that's found on the transcript 1800. All the basic managerial and supervisory job duties petitioner would perform while working for respondent was also performed when he was paid to manage construction of his friend's house. In addition to this job, he obtained a job as a courier for his brother in law. The fact he obtained two jobs should be sufficient on its own to show he's not entitled to an odd lot from total award. Furthermore, petitioner's employment history as a construction manager and his ability to work at least light duty would not support that there are no jobs for a person in his circumstance. One of the things I would like to clarify is that Mr. Short indicated that he has no college experience. That's actually not true. He has he has an associate's degree in refrigeration and air conditioning and a college certificate in construction management. What it boils down to is petitioner has an excellent transferable skills. He has training and experience using Word and Excel. He has supervisory and customer service skills. All these factors together work in petitioner's favor in finding gainful employment. Also, in addition to that, didn't the commission also find that the claimant did not provide sufficient documentation of a diligent job search? That is correct. Mr. Dolan, who was his expert, and Ms. Latham, who was the original VOC expert obtaining the case, both noted that he did not provide them with any job search logs to either one of them. And just in case it might have been missed by anyone. And one of these things, too, some people matter, some it doesn't. But I wasn't involved in this actual trial. So this is me kind of going through all of this, these facts. But it was noted that Ms. Latham had retired. And that's where there's from her. And then when they when my client obtained Ms. Berger to review the documents. So concerning the next year's issue is the wage differential. Petitioner argues that if he doesn't get the perm total, then that wage differential award under section 81 would be appropriate. So under section 81 of the act, it states that to be entitled, the employee must show he's personally incapacitated from pursuing his usual and customary line of employment. And two, there's a difference between the average amount and what the calculations between what he was able to earn to what he is able to earn in some suitable employment. Petitioner failed to prove either of the first or second prongs to satisfy wage differential award. And looking at the first prong, he was employed as a home construction manager. The very first job he found after the accident was as a home construction manager. If one were to ignore, Petitioner could go back to his prior line of work and thus eliminating the first prong, he still failed to satisfy the second prong. He reported he allegedly made only $5,000 of unreported income while doing this home construction project for his friend from March of 2011. And mind you, he was placed at MMI in February of 2011. And he worked for his friend on this home construction project from March of 2011 through September of 2012. He provided no pay stubs at the hearing or no documentation to support this testimony. He admitted he did not report this income. I presume he meant he did not report his earnings to the IRS for tax evasion purposes. So if he's willing to lie to the IRS about his lack of earnings, it stands to reason he would also lie at trial about what he made doing this home construction project. Concerning the second job he found as a courier, he likewise failed to provide any documentation to support his testimony. They only made $150 a week. I believe the commission was within his province. Petitioner was not credible as to his earning capabilities. And we would request that the commission decision on both the perm total and the wage differential and that petitioner fail to prove both be affirmed. Mr. Stile? Yeah. He has a title of construction manager with his employer. But there was testimony that he also engaged in manual labor. Is that true? That is accurate, correct. Okay. So where do we get the idea that construction manager does not include manual labor on the construction site? Well, there's going to be certain activities that he may not do the whole entire portion of his job. I guess as far as an example, as someone that's an attorney, you know, part of the function of my job is I type and I have to read the screen. I got to get files. Say I have a freak accident and I can't use my hands and arms. Okay. I can't type anymore. But that's part of my job. But that doesn't mean I still can't be a lawyer. Just like for him. So there might have been physical portions of his job. But he could still do his other job. Many parts of his job. I'm a little bothered by these folk experts seemingly going into a job survey and starting to look at jobs at Menards, jobs at fast food places. Where is there any, if any, where is there any, any discussion of construction management and the labor force or the availability of positions in the labor force or construction manager? Well, that was one of the things noted by Miss Berger that there were classes that she believed he could take. That there was a couple additional classes that he could take that would allow him to be more available to construction management jobs that are out there. And that was found on. Well, anyway, you know what, I apologize. I can't find it at the moment. You're saying it's there. That's fine. Let's accept that. But my question is, he has a certificate apparently in construction management. Am I correct? That's correct. Okay. Well, wouldn't that be sufficient to establish employability in the workforce as a construction manager? I believe it does, Your Honor. I do. I can see looking at it is one of those. Well, if that's the, you know, he's got the certificate, why are they looking at these other jobs? And I really can't answer why they have these other jobs listed. But I believe that might have been in the event. One would say that he can't do this job, then they must have looked at other jobs. But I don't know how to really speak to that outside of he's got a construction management certificate. Like you've indicated, which would mean from my standpoint, that he is not precluded from returning to work in his usual customary line of employment. Also, with regard to the denial of the wage differential award by the commission that you're asking us to uphold on that issue, the commission found 40 claimant may have suffered some diminishment of earning capacity, which may have entitled him to a wage differential award. But the record in this case contains no evidence from which the amount of any such award could be determined. First of all, there was clearly a stipulation, was there not, as to what the claimant's annual gross income was, and the projected average range of the diminished amount that he would be able to earn some suitable employment. So why would we uphold the denial of the wage differential award? Because the reasons cited by the commission don't seem to be accurate. Now, in terms of your first part, that there was a stipulation as to what his average weekly wage rate was at the time of accident, that is correct. Now, on the second prong, I'm not aware of the stipulation that you're suggesting that there was. Not stipulation, but evidence on the second prong. The first part was clearly by stipulation, we know that. Well, in terms of that second part, great question. The labor market survey was based in part on an FCE that demonstrated petitioner did not put forth full effort and without benefit of petitioner undergoing classes that has been recommended by Ms. Berger. Ms. Berger is the one who prepared the labor market survey and testified petitioner could work as a manager or supervisor, which would be in the same type of position petitioner's prior line of work. And that's in C-1926. Further, she also noted petitioner could increase his earning capacity to make more money if he took some classes which he had recommended. So, I believe that the commission then had an interview that Ms. Berger is not credible when it comes into his earning ability. We can't take his word for what he had made at the construction management job. The FCE that would be based on a bad faith act on his part by not putting forth a valid full effort in the FCE. And then also, you would also reward him for not engaging and taking classes that if he wanted to take additional classes. Mr. Stiles, Mr. Fallon, there seems to be some feedback going on. I don't know if that's your end or our end. You know what, I've got feedback on my end too. Well, does the clerk know anything about this? What's going on technically? Hello. I just unmuted. Did you move closer to your screen or further away? And I might have gotten closer. Resolved itself. So now it seems okay. Okay. I apologize. I would just go to the final part, though, is I believe that we could all agree that the workers Compensation Act is a remedial statute is not there to create a windfall for petitioner here. You know, I don't believe we have a full valid effort in the FCE, nor do we have, you know what we know petitioner could make you know what the minimum or, you know what the dollar amounts that he could make. At the end of the day, we do know that he can go back to work in construction management because he in fact did that. He did that for over, he did that for 18 months. This is a question that are an issue that can be presented by opposing counsel as well how you know this is not regular and continuous. The very nature of a job in home construction is to go from job to job, project to project, you know, so the person is not going to be building a house for their lifetime. So, he, he, and then look at the timeframe, released from care in February, February at MMI since they released from care but MMI is a job in March of 2012 or 2011 works until September of 2012. He then applies for social security disability in the end, or not applies by receives that at the end of 2012, he testified he did not look for any other jobs. After that. I see my time is up. Yes. Okay, very good. Thank you, Mr style. Mr short you may reply. Mr short. Turn your mic on, please. I apologize. Thank you. I'll try to be brief I think you discussed many of the things that I was going to bring up in reference to Miss burger she testified that most of the jobs that she found for him were in the nine to $10 hour range. And she never actually offered him those jobs or even told him about the jobs. The Alano case says that once the petitioner has established the primary patient case that he can't return to that job. It is the respondents burden to prove he is employable. They never found him a job. Mr. Mr style talked about this construction manager he found that through a friend, and he earned $5,000 in a year and a half that is not regular continuous employment. If they think he was capable of doing construction management, it the burden falls on them to show that there's a job for him he can apply for it if he doesn't get it. That's a question. But they did not meet their burden they brought this lady in and she said it best the best job she found for him with 13 to $16 an hour. But she admitted, those were theoretical, and that's on page 124 of the actual original testimony and she says it's nine to $10 an hour so that's that's the wage differential you've got your high and give them the benefit of the doubt at $10 an hour you've got what he earned. And he also worked. And it's important to court recognizes this. When counsel was talking about the, the, the variable nature of construction jobs. This was his family he worked for he worked for his family for 35 years it wasn't up and down up and down if you look at the surveillance video you'll see what shows him using a leaf blower. You'll see that his house is pretty nice as his man had a good living, and he lost it, and he's entitled to at least a wage differential. Thank you. Mr short What about this non response to taking classes to increase his skills to be a construction manager. Well first off, Mr burger on these classes, never actually communicated with my client never actually told him about any of these things. In fact, she says it's at the very bottom I say, after you completed this labor market survey, were you ever instructed by the respondent to tell Mr Peter Meyer these jobs existed her answers no. So it's not they didn't assist him in any way and they're obligated under a lot of in the law. And once he's met this prima facie case to help him find a job. They did the opposite they lay in wait, they have this list of this labor market survey and all these thoughts they don't relay them to him. And then they show up at trial and say I think he's able to work, no matter what. Well, if the court wants to accept that he's capable of something they've established the nine to $10 an hour range, the burden fell on them at that point he had a vocational expert saying he's not going to find a job. He had doctors say he's not going back to job, their bird, it's their bird not mine it's not his to show that there's a job for him. And they didn't do it. We'd asked for the wage differential at the very minimum. Thank you. Thank you counsel both for your arguments in this matter this morning.